**Opinion issued November 30, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00512-CR

_____

**JOSE ROBERTO AQUINO CALDERON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Case No. 1706950**

---

## MEMORANDUM OPINION

A jury found appellant, Jose Roberto Aquino Calderon, guilty of the felony offense of murder[1] and assessed his punishment at confinement for sixty years. In two issues, appellant contends that his due process rights were violated by the

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b), (c).

State's use of false testimony during the guilt phase of trial and the trial court erred in admitting certain evidence during the punishment phase of trial.

We affirm.

## Background

Roberto Guerra, III testified that he was a self-employed welder, who owned a welding shop located at 6736 Whitton Drive. The welding shop was behind Guerra's home. According to Guerra, the complainant, Danis Valladares, owned a tow truck business. The complainant owned three tow trucks, a yellow one, a silver one, and a white one, but the complainant usually drove his yellow tow truck. Guerra explained that he used to "weld on [the complainant's] tow truck," and he had known the complainant, who was his friend, for about eight years before the complainant's death.

On April 18, 2020, Guerra was barbecuing at his welding shop. He called the complainant to see if the complainant had "a transmission" that would work with a truck that Guerra had recently purchased. The complainant told Guerra that he would "be there in a minute." When the complainant arrived at Guerra's welding shop, the complainant and Guerra looked at Guerra's truck and discussed the transmission. When Guerra finished barbecuing, he asked the complainant if he wanted to eat. The two men sat outside and ate food together.

According to Guerra, at some point, the complainant's wife called him, and the complainant told her that he was "with the welder." The complainant's wife needed the complainant to pick up some food that she had ordered, so after Guerra and the complainant finished eating, Guerra took their plates inside his house and the complainant went to leave so that he could go pick up food at a restaurant for his wife. While inside his house, Guerra "heard [four] shots."

When Guerra walked back outside, he saw the complainant's yellow tow truck still parked in front of Guerra's driveway, with the door open. Guerra then walked through his gate and saw the complainant lying on the ground and a black Toyota Tundra truck with tinted windows backing up and leaving the scene, driving down Whitton Drive. Guerra did not see the shooter. Guerra told his son to call for emergency assistance. The complainant was "already purple." Guerra noted that one gunshot had hit the complainant and the other gunshots hit a car that was parked in Guerra's driveway and Guerra's yellow truck.

Juan Alvarez Flores testified that he lived at 6806 Whitton Drive, and Guerra's house was around the corner from Flores's home. Flores had known the complainant for about fifteen years before the complainant's death. The complainant drove a tow truck.

On April 18, 2020, Flores saw the complainant at Guerra's house when Flores passed by walking. It was not uncommon for Flores to see the complainant

3

at Guerra's house.  Around 5:30 p.m. that day, Flores saw a black Toyota Tundra truck, with tinted windows, "doing several rounds" in the neighborhood.  The black Toyota Tundra truck was driving on Whitton Drive.  While Flores was outside, he heard "shots" and saw "the truck [go] out."  Flores did not see who was inside the black Toyota Tundra truck.  The truck accelerated as it left the area.

Juan Alvarez-Galicia, Jr. testified that he lived at 6806 Whitton Drive with his parents.  Flores was his father.  Alvarez-Galicia's home was across the street from Guerra's home and around the corner from where the complainant was shot.  Alvarez-Galicia had known the complainant since he was a child.  The complainant was friendly, and Alvarez-Galicia had never seen "him in trouble" or "getting mad."  He was "always respectful."  According to Alvarez-Galicia, the complainant owned a tow truck business, and the complainant owned a white tow truck and a yellow tow truck.

Alvarez-Galicia explained that on April 18, 2020, he stopped by Guerra's home around 6:00 p.m. because Guerra was a welder and Alvarez-Galicia needed something fixed on his truck.  The complainant was at Guerra's house talking with Guerra.  Guerra told Alvarez-Galicia that he would help him with his truck after the complainant left because he was "cooking" right then.  Alvarez-Galicia then went and parked his truck in "a little driveway" near his house.  Alvarez-Galicia went his inside his home to leave his keys.  After about ten minutes,

4

Alvarez-Galicia walked back outside and started walking to where he knew Flores, his father, was standing outside on Whitton Drive, across from Guerra's house.

As Alvarez-Galicia walked toward Flores, he saw a black Toyota Tundra truck, with a "big chrome grille" on the front,[2] parked perpendicular to Guerra's driveway and the complainant's yellow tow truck in the street. Alvarez-Galicia saw the complainant by the door of his yellow tow truck talking to another person. Alvarez-Galicia described the person as a Hispanic male, with a beard, who was wearing a hat and jeans. It also looked like the male had a possible birthmark on the side of his face, but Alvarez-Galicia stated that he did not get a good look at the male standing with the complainant because his face was pointed down and he was "a little far" away. Alvarez-Galicia did not recognize the male. Alvarez-Galicia believed that the male was shorter than five feet, nine inches tall.

Alvarez-Galicia then heard gunshots, and he saw the male walk toward the black Toyota Tundra truck that was parked by Guerra's house with a firearm in his right hand. The male put the firearm in the door panel of the truck. The male then reversed the black Toyota Tundra and "took off" on Whitton Drive, driving eastbound.

When Guerra's son came out of his house and said the complainant's name, Alvarez-Galicia ran toward the back of the complainant's yellow tow truck and

---

[2]    Alvarez-Galicia believed that the black Toyota Tundra truck that he saw was "not a late model," but closer to "a 2010 model."

saw the complainant on the ground. His face was purple, and he did not have a pulse. It was obvious to Alvarez-Galicia that the complainant had been shot.

Carlos Sanabria testified that he was a mechanic and he owned a mechanic shop located at 6502 Whitton Drive. Sanabria explained that he had known the complainant for twenty years before the complainant's death, and the complainant had worked for Sanabria when he was younger. Eventually, the complainant started his own tow truck business. The complainant drove a yellow tow truck.

Sanabria also stated that he had known appellant for about eight years, and appellant was about five feet, seven inches tall. Appellant was Sanabria's customer, and Sanabria did oil changes for appellant when his cars needed maintenance. Appellant drove a black Toyota Tundra truck with a "brush grille."

On April 18, 2020, Sanabria was at his mechanic shop. The complainant stopped by the shop in the morning, and left around 10:30 a.m. or 11:00 a.m. The complainant was driving his yellow tow truck that day. The complainant did not return to Sanabria's shop later in the day.

Sanabria also testified that appellant came to the outside of Sanabria's mechanic shop on April 18, 2020, and he was driving his black Toyota Tundra truck. Appellant spoke to Jonathan Antia, who was the complainant's friend, outside of Sanabria's mechanic shop. Antia had driven his tow truck to Sanabria's shop that day. Appellant appeared to be "sort of aggressive" and looked angry, but

6

Sanabria could not hear what appellant and Antia were discussing.[3] At some point, appellant and Antia left the mechanic shop.

Later that evening, on April 18, 2020, appellant called Sanabria and told Sanabria, "I killed him," referring to the complainant, "because of a truck." According to Sanabria, the complainant had previously sold appellant a truck.

Antia testified that he had known the complainant for about fifteen years before the complainant's death and the complainant was his friend. He saw the complainant almost every day. The complainant was self-employed and owned a tow truck business. Antia also knew Sanabria and Guerra as well as appellant, and Antia's father had previously sold trucks to appellant. Antia stated that he had been to appellant's home, and he identified a photograph of appellant's home that was admitted into evidence at trial. The photograph showed the trucks that Antia's father had sold to appellant, which were sitting in front of appellant's house, as well as a black truck that Antia identified as the same truck that he had seen appellant driving on the day that the complainant was killed. The truck's windows were tinted, and it had a "steel bumper."

According to Antia, in 2020, he went with the complainant to "repossess [a] tow truck" because "[a] guy owed [the complainant] [$]500." Antia identified the

---

[3] Sanabria later testified that he had never seen appellant angry and never saw appellant threaten the complainant or Antia.

tow truck that the complainant "repossess[ed]" in a photograph that was admitted into evidence at trial.

Antia further testified that on April 18, 2020, he was at Sanabria's mechanic shop when appellant approached him at the shop. Appellant had driven a black Toyota Tundra truck to the shop that day. Appellant asked Antia "where [was] the tow truck," and Antia told him that he did not know. Appellant acted angry and "like he want[ed] the tow truck back," and he asked where the complainant was. The tow truck that appellant was looking for was the same tow truck that the complainant had previously "repossess[ed]" while Antia was with him. On April 18, 2020, Antia left Sanabria's mechanic shop and drove appellant around in Antia's truck to look for the tow truck that appellant had been asking about, but they did not see it. While they were driving around, appellant said that he would "drag" Antia with the tow truck, like "tie [him] up on [the] back of [the] truck and just drive off." Antia felt threatened by appellant.

Antia drove appellant as far as Guerra's house before he made a U-turn and drove back to Sanabria's mechanic shop. Antia thought that appellant made a comment about seeing the complainant while they were out driving. Back at Sanabria's mechanic shop, appellant got out of Antia's truck and asked Antia for his two cellular telephones. Appellant said that he was "going to go for a ride" and that he would bring the cellular telephones back to Antia. Appellant drove off

8

toward Guerra's house in his black Toyota Tundra truck. He was gone for about five minutes, and then came back to the shop. It appeared to Antia that appellant had driven back from the direction where Guerra's house was located. Appellant returned Antia's cellular telephones and said to Antia that he "took care of it." At about 7:30 p.m. that evening, Sanabria called Antia and told him that the complainant had been killed.

Gervacio Valladares ("Gervacio") testified that the complainant was his younger brother. Gervacio stated that the complainant had sold a tow truck to appellant, and the complainant had subsequently "repossess[ed]" the tow truck because of "lack of payment."

Alan Keate testified that he was the chief executive officer of Prime Asset, doing business as Texas Dealers Solutions ("Texas Dealers Solutions"), which was a "secondary financing source for Buy Here Pay Here automotive loans." Essentially, Buy Here Pay Here car dealers offered "in-house financing" for people purchasing cars, and Texas Dealers Solutions would later buy the car loans from Buy Here Pay Here car dealers. After the purchase, the car loans belonged to Texas Dealers Solutions, and it collected on them. Texas Dealers Solutions became the lienholder on the purchased car. According to Keate, law enforcement officers contacted Texas Dealers Solutions about appellant, who was one of its customers.

9

Keate further testified that on May 8, 2018, appellant and his wife, Ana Ramirez, purchased a 2013 black Toyota Tundra truck from Latinos Unidos Auto Sales in Houston. They owned the truck jointly; they were "both equally liable for [the] vehicle." Appellant and Ramirez had "finance[d] the vehicle that they [had] purchased" with Latinos Unidos Auto Sales. Subsequently, on April 20, 2020, Texas Dealers Solutions purchased the car loan related to appellant's black Toyota Tundra truck from Latinos Unidos Auto Sales.

According to Keate, based on Texas Dealers Solutions's records, appellant had car insurance for the black Toyota Tundra truck, and appellant was listed as an operator of the truck on the insurance policy. Texas Dealers Solutions received payment on the car loan related to appellant's black Toyota Tundra truck on April 23, 2020. The last payment that Texas Dealers Solutions received on the car loan related to appellant's black Tundra Truck was on October 28, 2020. That meant that appellant made loan payments related to his truck after the complainant's death in April 2020. At some point between November 2020 and February 2021, contact between appellant and Texas Dealers Solutions ceased. When Texas Dealers Solutions, after February 2021, repossessed appellant's black Toyota Tundra truck, it was in good condition and appellant and Ramirez only had $75.23 left to pay on their car loan for the truck. Keate did not know who was driving appellant's black Toyota Tundra on April 18, 2020.

10

Houston Police Department ("HPD") Officer J. Amesquita testified that he was on patrol on April 18, 2020, when he was dispatched to 6736 Whitton Drive, Harris County, Texas at 6:22 p.m. in response to a call about "a shooting driveby [that had] just occurred." The shooting was near the intersection of Whitton Drive and O'Hara Drive. When he arrived, Amesquita saw the complainant laying on the side of the road on O'Hara Drive. The complainant's body was discolored, and "[he] was purple in the face." The complainant was pronounced dead at the scene. According to Amesquita, the cause of the complainant's death was "[a] gunshot wound to his torso." Amesquita saw the gunshot wound, which was on the complainant's "front chest area."

While at the scene, Officer Amesquita received information that a black Toyota Tundra truck had been seen leaving the scene after the shooting, travelling eastbound on Whitton Drive. There were three witnesses at the scene, Alvarez-Galicia, Mario Garcia, and Guerra. After speaking with at least one of the witnesses, Amesquita informed the dispatch operator that the shooter may have been "a heavy[-]set male with a beard," approximately "5'10 to 6 feet tall," and "[i]n his thirties," wearing a hat. The shooter may have had a "mole" on the left side of his face. Amesquita noted that appellant's appearance at trial did not match the description of the shooter that he gave to the dispatch operator. However, Amesquita also testified that the shooter was a "Hispanic male" and the "suspect

11

vehicle" was a black Toyota Tundra truck, which were consistent with appellant's characteristics.

HPD Detective K. Clark testified that she and her partner, HPD Detective M. Nicotra, were assigned to investigate the complainant's death, which occurred on April 18, 2020. Clark arrived at the scene, near the intersection of O'Hara Drive and Whitton Drive in Harris County, around 7:00 p.m. on April 18, 2020. According to Clark, the complainant was shot near the corner of O'Hara Drive and Whitton Drive after he had been visiting Guerra's home, located at 6736 Whitton Drive. It appeared that he had been walking to his yellow tow truck[4] and was about to leave just before he was shot. Clark saw the complainant lying on the ground "just at the rear of his own vehicle[,] with the driver's side door open." The complainant's death was caused by a "gunshot wound to the chest" and a "firearm was used" to kill him.[5] Clark noted that several of Guerra's cars, which were parked near the complainant's tow truck, sustained damaged from gunshots, and witnesses reported that they had heard four gunshots that night. Witnesses also reported that a black Toyota Tundra truck had been involved in the shooting; the truck was seen "prior to the shooting" and "seen fleeing the location at a high

---

[4]     Detective Clark stated that the complainant's tow truck said "Valladares Towing on it" and "every person . . . in the neighborhood knew that [it] was his vehicle."

[5]     Detective Clark testified that law enforcement officers found the complainant's cellular telephone and wallet on his body, and the wallet contained "a fairly large amount of cash." This indicated that the complainant had not been robbed because "[a]ll of his property was still on his person."

12

rate of speed" after the shooting. The shooter was identified as a Hispanic male, possibly in his late twenties or early thirties, with a beard and a hat. Witnesses at the scene could not identify the shooter by name.

Additionally, Detective Clark testified that during her investigation she spoke with Gervacio, the complainant's brother, who knew about the complainant's "business and his transactions." Gervacio knew that the complainant towed cars and that he would "buy and sell cars." According to Gervacio, "somebody owed [the complainant] money for a tow truck" that the complainant had sold to the person, and "the only person . . . [that the complainant] had problems with was the person that owed [him] money for the tow truck." But Gervacio did not provide Clark with the name of that person.

Detective Clark also spoke with Antia, who was the complainant's friend, and he knew "who killed [the complainant]." He knew that the person owed the complainant money, and Antia told Clark that the person had "t[aken] money and a truck from" Antia and Antia's father as well. Antia knew where the person lived, and Antia told Clark the person's name. Clark was able to confirm that the address provided by Antia was appellant's address. Clark noted that Antia had contact

13

with the person "who killed [the complainant]" on April 18, 2020 at Sanabria's mechanic shop.[6] Antia identified appellant in a photograph that Clark showed him.

Detective Clark further explained that Antia was with the complainant on the night that the complainant decided to "repossess[] his [tow] truck." The complainant and Antia had gone looking for the tow truck about a month before the complainant was killed. Antia also gave a statement to law enforcement officers in which he said that appellant "came to [Sanabria's mechanic] shop on the day of the murder in a black Toyota Tundra looking for [the complainant], wanting his tow truck back. [Appellant] was upset. He wanted his tow truck back."

Detective Clark also spoke with the complainant's wife, Evelyn, during her investigation, and Evelyn "ha[d] knowledge of who [the complainant] had problems with." She told Clark "a possible name" as well as "a vehicle description and where [the person] lived," and Evelyn "kn[e]w why" the complainant had been killed. While viewing a photograph of appellant's home, which was admitted into evidence at trial, Clark stated that "this [was] where" Evelyn told Clark that the person who she believed killed the complainant lived. Clark noted that the photograph showed a black Toyota Tundra truck, with tinted windows and a "brush guard bumper on the front," parked in front of appellant's home—which Clark identified as "the suspect vehicle that was used in the murder."

---

[6] Detective Clark stated that Sanabria's mechanic shop was about a quarter of a mile away from the location where complainant was shot; it was "down the street."

14

Detective Clark further explained that she received a ledger from Evelyn which showed that the complainant had sold a tow truck. The last payment for the tow truck was made in April 2019, but the complainant was supposed to be receiving $500 a month for the tow truck. Only a portion of what was owed for the tow truck had been paid.

Additionally, Detective Clark testified that, based on evidence obtained from the complainant's cellular telephone, she learned that appellant's contact information was saved in the complainant's cellular telephone. And in January 2020, the complainant contacted appellant and "asked for his money" related to a tow truck that the complainant had sold to appellant. On January 2, 2020, appellant sent the complainant a message[7] saying, "I'll call you later . . . [t]o pay you." And the complainant responded, "Ok, but let it be true it's been a long time waiting." On January 6, 2020, the complainant sent appellant a message saying, "[S]o what's up, you already have the money for the truck I've been waiting too long if not I'm going to go get the truck, don't say anything later." Appellant responded, "I'll let you know." On January 9, 2020, the complainant sent

---

[7] The complainant and appellant sent messages to each other through "WhatsApp," "an application [for cellular telephones] that allows users to send and receive text, picture, audio, and video messages." *United States v. Ojimba*, Case No. CR-17-246-D, 2018 WL 1884822, at *2 (D. Okla April 19, 2013) (order); *see also United States v. Otunyo*, Crim. Action No. 18-251 (BAH), 2020 WL 2065041, at *2 n.2 (D.D.C. Apr. 28, 2020) (mem. op.) ("WhatsApp is [a] messaging application for cell phones that allows users to exchange text, pictures, and other media." (alteration in original) (internal quotations omitted)).

appellant a message saying, "[S]o what's up with my money." On January 14, 2020, the complainant sent appellant a message saying, "If you don't give me the money for the truck I'm going to tak[e] a girl who will say that you've abused her at your house." And on February 1, 2020, the complainant sent appellant a message saying, "I'm . . . looking for you to pay me the money for the tow truck[.] [I]t's been 5 months that you haven't given me anything only . . . lies." On February 10, 2020, the complainant sent appellant a message saying, "It's been more than 6 months that you haven't made any payment for the tow truck the total is $3,500 . . . if I repo it[,] it will go up to $4,000." Also on February 10, 2020, the complainant sent appellant a message saying, "I'm tired of calling you and you never answer." Clark testified that eventually the complainant repossessed the tow truck.

As to the black Toyota Tundra truck, Detective Clark explained that appellant had a 2013 black Toyota Tundra truck registered to his name. Appellant had purchased the truck in 2018—two years before the complainant was killed. This truck matched the "suspect vehicle" that witnesses had seen leaving the scene after the complainant was shot and that law enforcement had seen on videotape surveillance recordings fleeing the scene.[8] Clark was able to confirm that appellant

---

[8] Detective Clark explained that law enforcement officers, after the complainant's death, obtained videotape surveillance recordings from nearby businesses which showed a black Toyota Tundra truck, "with heavily tinted windows, dark wheels,

16

still owned the truck at the time of the complainant's death, and he had made payments on his car loan after the complainant's death. Appellant's neighbors knew that appellant owned a black Toyota Tundra truck, but it was not seen outside of appellant's home after the date of the complainant's death, even though appellant was still making loan payments related to it. Law enforcement officers did not find appellant's 2013 black Toyota Tundra truck until about a year after the complainant's death.

Detective Clark also testified that during her investigation she was able to obtain certain call records from appellant's cellular telephone, and they showed that appellant called Sanabria at 6:32 p.m. on April 18, 2020, which would have been soon after the complainant had been shot.[9] When Clark confronted Sanabria about the call, he decided to cooperate with law enforcement officers. According to Clark, Sanabria knew who had killed the complainant and why that person had killed the complainant. Clark showed Sanabria a photograph of appellant, and Sanabria identified appellant as the person that had killed the complainant. Clark

a brush guard bumper" and "[an] inspection registration sticker [that] was placed very high[] on the interior of the windshield," and that truck matched the black Toyota Tundra truck that was seen outside of appellant's home. Detective Nicotra testified extensively as to what the videotape surveillance recordings showed related to the black Toyota Tundra truck and its path away from the scene. And Detective Clark testified about the placement of the inspection sticker on appellant's truck.

[9] According to Detective Clark, law enforcement officers believed that the complainant was shot between 6:15 p.m. and 6:18 p.m. on April 18, 2020.

17

explained that during Sanabria's interview with law enforcement officers, Sanabria told officers that appellant had called him on April 18, 2020 and said, "I just killed him" and "[T]here were people there and I killed him." (Internal quotations omitted.) According to Clark, Sanabria stated that appellant had "called him and told him that he killed [the complainant] with a gun. There were people around. He did not care. He killed [the complainant] because he was robbed."

In summation, Detective Clark testified that during her investigation "there was only one person . . . that [she] learned had a problem with [the complainant]; and it was over one thing, which [was] a tow truck that [the complainant had] sold to [that person] and the [person] never paid in full for it."

Dr. Marianne Beynon, an assistant medical examiner with the Harris County Institute of Forensic Sciences, testified that she performed the autopsy on the complainant's body. The complainant sustained a gunshot wound to his chest. The cause of the complainant's death was "[g]unshot wound of the chest" and the "manner of death" was homicide.[10]

---

[10] We note that additional witnesses testified at trial, including Shu Sean Zheng, who testified for the defense that appellant did the landscaping at his home. The Court has reviewed the complete record in this appeal. *See* TEX. R. APP. P. 47.1; *Obernhoff v. Nelson*, No. 01-17-00816-CV, 2019 WL 4065017, at *18 n.19 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.); *Sullivan v. Arguello Hope & Assocs., PLLC*, No. 03-18-00144-CV, 2018 WL 6424200, at *1 n.2 (Tex. App.—Austin Dec. 7, 2018, no pet.) (mem. op.) ("Because the parties are familiar with the facts of the case and its procedural history, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it.").

18

## False Testimony

In his first issue, appellant argues that his due process rights were violated because the State "present[ed] [the] false testimony [of Sanabria] to obtain [a] conviction." *See* U.S. CONST. amend. V, XIV.

The use of material false testimony by the State to procure a conviction violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. *Ukwuachu v. State*, 613 S.W.3d 149, 156 (Tex. Crim. App. 2020); *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011); *Rodriguez v. State*, 491 S.W.3d 18, 32 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). To constitute a due process violation, the testimony used by the State must: (1) have been, in fact, false and (2) have been material to the defendant's conviction, meaning "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *See Ex parte Robbins*, 360 S.W.3d at 459–60 (internal quotations and footnote omitted); *see also Ukwuachu*, 613 S.W.3d at 156; *Charles v. State*, No. 01-19-00725-CR, 2022 WL 3093025, at *10 (Tex. App.—Houston [1st Dist.] Aug. 4, 2022, pet. dism'd) (mem. op., not designated for publication).

False evidence claims are subject to the traditional rules of error preservation. *See Valdez v. State*, No. AP-77,042, 2018 WL 3046403, at *5–7 (Tex. Crim. App. June 20, 2018) (not designated for publication); *Estrada v. State*,

313 S.W.3d 274, 288 (Tex. Crim. App. 2010); *see also Barlow v. State*, No. 05-21-00392-CR, 2022 WL 16847694, at *7 (Tex. App.—Dallas Nov. 10, 2022, no pet.) (mem. op., not designated for publication); *Mireles v. State*, No. 08-19-00221-CR, 2022 WL 3572859, at *11–12 (Tex. App.—El Paso Aug. 19, 2022, pet. ref'd) (mem. op., not designated for publication); *Flores v. State*, No. 01-17-00959-CR, 2019 WL 1029291, at *2–4 (Tex. App.—Houston [1st Dist.] Mar. 5, 2019, pet. ref'd) (mem. op., not designated for publication) (holding defendant failed to preserve due-process complaint that State knew testimony was false and failed to correct it).

To preserve a complaint for appellate review, a defendant must show that he made his complaint to the trial court by a timely and specific request, objection, or motion, and the trial court either ruled on his request, objection, or motion, or refused to rule, and he objected to that refusal. TEX. R. APP. P. 33.1(a); *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003). The rationale of rule 33.1 is that if an objection is raised before the trial court as soon as error becomes foreseeable, the error may be addressed and possibly corrected or avoided. *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009). Almost all error must be preserved by objection, or it is waived. *See Hull v. State*, 67 S.W.3d 215, 216–18 (Tex. Crim. App. 2002);

20

*Holland v. State*, 802 S.W.2d 696, 700–01 (Tex. Crim. App. 1991); *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990).

Notably, the failure to object in a timely and specific manner forfeits an appellate complaint about the admissibility of evidence, even if its admission violates a constitutional right. *See Valdez*, 2018 WL 3046403, at *5; *Saldano v. State*, 70 S.W.3d 873, 886–87 (Tex. Crim. App. 2002); *see also Briggs*, 789 S.W.2d at 924 (defendant may waive his right to due process by failing to object at trial). And a defendant who does not object to the State's use of allegedly false evidence at trial fails to preserve his complaint for appellate review. *Davis v. State*, 276 S.W.3d 491, 499–500 (Tex. App.—Waco 2008, pet. ref'd); *Haliburton v. State*, 80 S.W.3d 309, 315 (Tex. App.—Fort Worth 2002, no pet.) (holding defendant must object when witness gives allegedly false testimony to preserve issue for appellate review); *see also Shaw v. State*, No. 04-17-00535-CR, 2018 WL 2418439, at *1 (Tex. App.—San Antonio May 30, 2018, pet. ref'd) (mem. op., not designated for publication) ("A defendant must object to the false testimony of a witness to preserve the issue for appellate review.").

In his briefing, appellant concedes that he "did not raise [his] false evidence" complaint in the trial court and that "[c]ourts have held that [a] defendant must object to the State's use of allegedly false evidence to preserve the complaint for appeal." (Internal quotations omitted.) However, he asserts that we may ignore

21

the preservation requirement in this case and "address[] the merits of [his] false evidence" complaint based on the Texas Court of Criminal Appeals's decisions in *Ukwuachu* and *Estrada*. *But see Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) ("If an issue has not been preserved for appeal, neither the court of appeals nor th[e] [Texas] Court [of Criminal Appeals] should address the merits of that issue.").

In *Ukwuachu*, the defendant, who was convicted of the offense of sexual assault, asserted in the court of appeals that the State's use of certain "unadmitted phone records to cross-examine [witnesses during trial] created a false impression with the jury" that violated his due process rights. 613 S.W.3d at 154 (internal quotations omitted). The court of appeals agreed and held that the State's use of the "phone records amounted to false evidence that materially affected the outcome of [the defendant's] trial." *Id.* at 155. The Texas Court of Criminal Appeals granted the State's petition for discretionary review to address whether the defendant could raise a false evidence complaint where he did not "point[] to [any] specific testimony from any witness that actually left the jury with a false impression." *Id.* at 155–58. Instead, the defendant focused his complaint on the "State's questions and arguments," which he asserted were misleading. *Id.*

Before addressing the merits of the issue raised by the State in its petition for discretionary review, the Texas Court of Criminal Appeals explained that "[t]his

22

[was] the second time [that] th[e] [c]ourt ha[d] granted the State's petition for discretionary review in th[e] case." *Id.* at 150 n.1; *see also Ukwuachu v. State*, No. PD-0366-17, 2018 WL 2711167, at *1–4 (Tex. Crim. App. June 6, 2018) (not designated for publication) (granting State's petition for discretionary review and holding court of appeals erred in concluding certain text-message evidence was required to be admitted under Texas Rule of Evidence 412 because complaint based on rule 412 had not been preserved and court of appeals erred in holding text-message evidence should have been admitted under Texas Rule of Evidence 107). Previously, the Texas Court of Criminal Appeals had granted review of the court of appeals's first decision in the appeal, which had reversed the defendant's conviction based on a holding that the "trial court had erroneously excluded" certain text-message evidence. *Ukwuachu*, 613 S.W.3d at 150 n.1; *see also Ukwuachu v. State*, No. 10-15-00376-CR, 2017 WL 1101284, at *1–3 (Tex. App.—Waco Mar. 22, 2017) (holding exclusion of text-message evidence was erroneous and harmed defendant), *rev'd*, No. PD-0366-17, 2018 WL 2711167 (Tex. Crim. App. June 6, 2018) (not designated for publication). The Texas Court of Criminal Appeals disagreed with the court of appeals's holding, reversed the court of appeals's judgment, and remanded the case to the court of appeals for consideration of the defendant's remaining issues. *Ukwuachu*, 613 S.W.3d at 150 n.1. On remand, the court of appeals, considering the defendant's other issues,

23

again reversed the defendant's conviction, holding that the defendant's conviction was "based on the introduction of false evidence at his trial" which violated his constitutional rights. *Id.*; *see also Ukwuachu v. State*, No. 10-15-00376-CR, 2019 WL 3047342, at *1–4 (Tex. App.—Waco July 10, 2019), *rev'd*, 613 S.W.3d 149 (Tex. Crim. App. 2020).

Thus, while considering the appeal for a second time, the Texas Court of Criminal Appeals noted, related to the defendant's false evidence complaint—of which the court of appeals had addressed the merits on remand—that the court of appeals never considered whether the defendant's "false evidence complaint was preserved with a timely objection at trial." *Ukwuachu*, 613 S.W.3d at 155 n.10. Further, the court explained that it could remand the case to the court of appeals again based on its failure to consider preservation before addressing the merits of the defendant's complaint, but in the interest of judicial efficiency, particularly because the case had already been remanded to the court of appeals once, the Texas Court of Appeals decided that it would "assume without deciding that the [false evidence complaint] was preserved and address the merits." *Id.*

Significantly, the Texas Court of Criminal Appeals's decision in *Ukwuachu* does not negate our need to consider whether appellant, in this case, preserved his complaint that his due process rights were violated because the State "present[ed] [the] false testimony [of Sanabria] to obtain [a] conviction." And it certainly

24

implies that the court of appeals in *Ukwuachu* should have considered preservation before addressing the merits of the defendant's false evidence complaint in that case. *See Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016) ("Preservation of error is a systematic requirement. The systematic nature of the requirement means that a first-tier appellate court may not *reverse* a judgment of conviction without first addressing any issue of error preservation." (internal footnotes omitted)); *see also Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005) ("Because we have held that preservation of error is a systematic requirement that must be reviewed by the courts of appeals regardless of whether the issue is raised by the parties, our inquiry into whether [the defendant] properly preserved [his] alleged error is appropriate.").

As to the second Texas Court of Criminal Appeals's decision that appellant relies on to assert that we should address the merits of his false evidence complaint despite his failure to preserve it, in *Estrada*, the defendant complained that his constitutional rights had been violated because the State had presented "false and misleading testimony on a crucial issue at the [punishment] phase of his trial." 313 S.W.3d at 286. Notably, the State agreed that the defendant was entitled to a new trial on punishment based on his false evidence complaint, and the State asserted that the Texas Court of Criminal Appeals should grant relief on the merits of the defendant's complaint even though no objection was raised in the trial court. *Id.* at

25

288. The court, in *Estrada*, excused the defendant's failure to object at the time the false testimony was admitted into evidence because the defendant did not know and "could not reasonably be expected to have known that the testimony [presented during the punishment phase] was false" when it was made. *Id.*

Unlike *Estrada*, here, appellant was aware that Sanabria had made prior statements that were inconsistent with his testimony at trial, and the State had timely disclosed those prior inconsistent statements. Thus, appellant was obligated to object in the trial court to Sanabria's allegedly false testimony to preserve for our review his complaint that due process rights were violated because the State "present[ed] [the] false testimony [of Sanabria] to obtain [a] conviction." *See Valdez*, 2018 WL 3046403, at *5–7 (distinguishing *Estrada* because defendant was aware of contradictory facts in witness previous statements and did not object when statements admitted into evidence at trial); *see also Tennard v. State*, No. 14-19-00557-CR, 2020 WL 6072830, at *2 (Tex. App.—Houston [14th Dist.] Oct. 15, 2020, pet. ref'd) (mem. op., not designated for publication) ("When [false evidence complaints] are raised on direct appeal, they are subject to the traditional rules of error preservation, which means that the defendant must have objected at the time the evidence was offered, unless there was no way for the defendant to reasonably know that the evidence was false."); *Flores*, 2019 WL 1029291, at *3 ("[A defendant] forfeits [his] due-process complaint, arising from the State's

submission of—or failure to correct—false statements, when the record shows that she was aware of the alleged falsehoods but did not make a timely and specific objection."). As appellant concedes, that was not done in this case.

We hold that appellant has not preserved for appellate review his complaint that his due process rights were violated because the State "present[ed] [the] false testimony [of Sanabria] to obtain [a] conviction."

**Admission of Punishment Evidence**

In his second issue, appellant argues that the trial court erred in admitting into evidence a "criminal complaint and judgment" "to prove that [appellant] had previously been convicted of" the offense of "illegal entry into the United States" because it was "uncertified" and "[t]he State presented th[e] two documents through [a] witness . . . who did not work for the federal court that created the documents and who had no familiarity with [appellant] other than what was contained in his file."

During the punishment phase of trial, evidence as to any matter deemed relevant to sentencing may be admitted. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1); *Rodriguez v. State*, 546 S.W.3d 843, 862 (Tex. App.—Houston [1st Dist.] 2018, no pet.). We review a trial court's decision to admit evidence for an abuse of discretion. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *see also Schultze v. State*, 177 S.W.3d 26, 40 (Tex. App.—Houston

27

[1st Dist.] 2005, pet. ref'd) ("A trial court has broad discretion in determining the admissibility of evidence presented at the punishment phase of trial."). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Texas law permits the admission of a defendant's extraneous offenses or bad acts during the punishment phase of trial under certain circumstances. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1); *Huizar v. State*, 12 S.W.3d 479, 483–84 (Tex. Crim. App. 2000); *see also* TEX. R. EVID. 403, 404(b).

Here, during the punishment phase, the trial court admitted into evidence, as State's Exhibit 92, a copy of a judgment of conviction from the United States District Court for the Western District of Texas, stating that on September 5, 2006, "Jose Roberto Aquino-Calderon" pleaded guilty to the offense of improper entry by an alien and his punishment was assessed at confinement for 120 days. *See* 8 U.S.C. § 1325; *see also Infante v. State*, 25 S.W.3d 725, 727 (Tex. App.—

28

Houston [1st Dist.] 2000, pet. ref'd) ("Unsanctioned entry into the United States is a crime subject to fine and imprisonment."). The trial court also admitted into evidence, as State's Exhibit 93, a copy of a criminal complaint filed in the United States District Court for the Western District of Texas, alleging that on August 27, 2006, "Jose Roberto Aquino-Calderon, a native and citizen of El Salvador was arrested by Border Patrol Agents and subsequent investigation revealed that [he was] an alien illegally in the United States," who "last entered the United States illegally from the Republic of Mexico by crossing the Rio Grande River at a time and place other than as designated by [i]mmigration [o]fficers, near Eagle Pass, Texas." (Emphasis omitted.)

Appellant first complains that the trial court erred in admitting State's Exhibits 92 and 93 into evidence because they were "uncertified" documents. As previously explained, to preserve a complaint for appellate review, a defendant must show that he made his complaint to the trial court by a timely and specific request, objection, or motion, and the trial court either ruled on his request, objection, or motion, or refused to rule, and he objected to that refusal. TEX. R. APP. P. 33.1(a); *Griggs*, 213 S.W.3d at 927; *Geuder*, 115 S.W.3d at 13. Almost all error, even constitutional error, must be preserved by objection or it is waived. *See Hull*, 67 S.W.3d at 216–18; *Holland*, 802 S.W.2d at 700–01; *Briggs*, 789 S.W.2d at 924.

Notably, to preserve error, "a [defendant] must be specific enough so as to let the trial [court] know what he wants, why he thinks himself entitled to it, and do so clearly enough for the [trial court] to understand him at a time when the trial court is in a proper position to do something about it." *Resendez v. State*, 306 S.W.3d 308, 312–13 (Tex. Crim. App. 2009) (internal quotations omitted). "The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial [court] of the basis of the objection and give [it] the opportunity to rule . . . ; [and] (2) to give opposing counsel the opportunity to respond to the complaint." *Id.* at 312.

A defendant also fails to preserve error when the contention urged on appeal does not match with the specific complaint made in the trial court. *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). In other words, an objection stating one legal basis may not be used to support a different legal theory on appeal. *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004).

Appellant, during the punishment phase of trial, did not object to the admission of State's Exhibits 92 and 93 into evidence because they were "uncertified." Instead, appellant objected that "the certified copies of the judgment and [complaint], standing alone, [were] not sufficient to prove the allegations that th[e] judgment and complaint [were] of the same defendant that's on trial, without a pen packet and an expert witness identifying that the prints [were] identical with

the known prints of the accused." And appellant objected that Andres Bismonte, a deportation officer with the United States Department of Homeland Security, Immigration and Customs Enforcement, who testified during the punishment phase of trial, "ha[d] no knowledge about the information contained in the[] documents." Because appellant did not object to the admission of State's Exhibits 92 and 93 on the basis that they were "uncertified," we hold that he has not preserved for appellate review his complaint on appeal that the trial court erred in admitting State's Exhibits 92 and 93 because they were "uncertified" documents.[11] *See Braxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) ("An objection stating one legal theory may not be used to support a different legal theory on appeal." (internal quotations omitted)); *Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd) ("Where a trial objection does not comport with the issue raised on appeal, the appellant has preserved nothing for review.").

Appellant next argues that the trial court erred in admitting State's Exhibits 92 and 93 into evidence because the State did not sufficiently link appellant to the September 5, 2006 judgment of conviction from the United States District Court for the Western District of Texas for the offense of improper entry by an alien or to

---

[11] Even if appellant had preserved his complaint that the trial court erred in admitting State's Exhibits 92 and 93 because they were "uncertified" documents and we presumed that the trial court erred in admitting the exhibits, the same harmless-error analysis discussed below would apply. *See infra*.

31

the copy of a criminal complaint filed in the United States District Court for the Western District of Texas related to the offense of improper entry by an alien.

To establish that the defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007); *Kinnett v. State*, 623 S.W.3d 876, 896 (Tex. App.— Houston [1st Dist.] 2020, pet. ref'd). There is no specific document or mode of proof required to establish that a prior conviction exists, and that the defendant is linked to that conviction. *Flowers*, 220 S.W.3d at 921; *Kinnett*, 623 S.W.3d at 896. Nor is there a "best evidence" rule in Texas that requires a prior conviction be proven with any document, must less any specific document. *Flowers*, 220 S.W.3d at 921 (internal quotations omitted). "Any type of evidence, documentary or testimonial," may suffice to prove a prior conviction. *Id.* at 922; *see also Kinnett*, 623 S.W.3d at 896. The fact finder looks at the totality of evidence admitted concerning the prior conviction to determine (1) whether there was a prior conviction and (2) whether the defendant was the person convicted. *Flowers*, 220 S.W.3d at 923; *see also Henry v. State*, 509 S.W.3d 915, 919 (Tex. Crim. App. 2016) (fact finder "must look at the totality of the evidence adduced" and "must consider the evidence as a whole, as each piece of evidence may provide little meaning if considered in isolation"). Although the State may establish the

existence of a prior conviction by admitting a certified copy of the judgment, it is not normally sufficient, standing alone, to link the defendant to the prior conviction, even if the name on the judgment and sentence match that of the defendant in trial. *See Beck v. State*, 719 S.W.2d 205, 209–10 (Tex. Crim. App. 1986); *Paschall v. State*, 285 S.W.3d 166, 174–75 (Tex. App.—Fort Worth 2009, pet. ref'd).

Here, for purposes of this opinion, we will presume, without deciding, that the trial court erred in admitting State's Exhibits 92 and 93 into evidence because the State did not sufficiently link appellant to the alleged prior conviction for the offense of improper entry by an alien. *See* 8 U.S.C. § 1325; *see also Martin v. State*, No. 14-21-00736-CR, 2023 WL 3115779, at *10 (Tex. App.—Houston [14th Dist.] Apr. 27, 2023, no pet.) (mem. op., not designated for publication) (where defendant argued trial court erred in admitting certain exhibits related to extraneous offenses because State offered no evidence linking him to documents, assuming, without deciding, that trial court erred). But the erroneous admission of evidence constitutes non-constitutional error that is subject to a harm analysis. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also Paroline v. State*, 532 S.W.3d 491, 502 (Tex. App.—Texarkana 2017, no pet.) ("If the trial court errs in admitting extraneous-offense evidence in the punishment phase, it is non-constitutional

error."). Thus, we may reverse only if the defendant shows the erroneous admission affected his substantial rights. *See* TEX. R. APP. P. 44.2(b); *Coble*, 330 S.W.3d at 280; *see also Rodriguez*, 546 S.W.3d at 864–65. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble*, 330 S.W.3d at 280; *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Notably, if the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless, and we will not overturn the criminal conviction. *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011); *Coble*, 330 S.W.3d at 280.

We review the entire record to determine the effect or influence of the wrongfully admitted evidence on the jury's decision. *Barshaw*, 342 S.W.3d at 93–94; *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis. *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *see also Motilla*, 78 S.W.3d at 355–60; *Kamen v. State*, 305 S.W.3d

34

192, 197–99 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). And we may consider closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Paroline*, 532 S.W.3d at 502.

Here, appellant argues that he was harmed by the trial court's erroneous admission of State's Exhibits 92 and 93 during the punishment phase of trial because it "increase[d] the sentence levied against him" and was "central to the State's punishment case."

As noted above, State's Exhibit 92 is a copy of a judgment of conviction from the United States District Court for the Western District of Texas, stating that on September 5, 2006, "Jose Roberto Aquino-Calderon" pleaded guilty to the offense of improper entry by an alien and his punishment was assessed at confinement for 120 days. *See* 8 U.S.C. § 1325. And State's Exhibit 93 is a copy of a criminal complaint filed in the United States District Court for the Western District of Texas, alleging that on August 27, 2006, "Jose Roberto Aquino-Calderon, a native and citizen of El Salvador was arrested by Border Patrol Agents and subsequent investigation revealed that [he was] an alien illegally in the United States," who "last entered the United States illegally from the Republic of Mexico by crossing the Rio Grande River at a time and place other than as

35

designated by [i]mmigration [o]fficers, near Eagle Pass, Texas." (Emphasis omitted.)

At the beginning of the punishment phase of trial, the State "reoffer[ed] all evidence from the guilt phase of trial." Notably, during the guilt phase of trial, several witnesses testified, without objection, that appellant was from El Salvador. For instance, Detective Clark testified that appellant had an "El Salvadorian passport." And Keate testified that both appellant and his wife, Ramirez, had passports issued from El Salvador. Further, appellant elicited testimony from Clark identifying appellant as being "from El Salvador."

Moreover, during the punishment phase of trial, appellant's wife, Ramirez, testified, without objection, that she met appellant in El Salvador and their first two children were born there. Ramirez also testified that appellant had been deported from the United States and he came back to the United States. Appellant testified that he and his family came to the United States from El Salvador in 1998.

The Texas Court of Criminal Appeals has repeatedly held that any error in the admission of evidence is harmless where the same or similar evidence was admitted without objection. *See Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998); *see also Coble*, 330 S.W.3d at 282 & n.82. And we note that the State did not emphasize appellant's prior conviction for the offense of improper entry by an alien during its closing argument at the punishment phase of trial. *See Motilla*,

36

78 S.W.3d at 355–56, 359; *see also Hopkins-McGee v. State*, No. 01-19-00475-CR, 2020 WL 7251452, at *12–13 (Tex. App.—Houston [1st Dist.] Dec. 10, 2020, no pet.) (mem. op., not designated for publication) (holding any error in admission of exhibit was harmless where State only made single reference to exhibit during closing argument); *Grant v. State*, No. 01-12-01173-CR, 2014 WL 1318885, at *4–5 (Tex. App.—Houston [1st Dist.] Apr. 1, 2014, pet. ref'd) (mem. op., not designated for publication) (holding any error in admission of three photographs was harmless where State did not emphasize that evidence during its closing argument). The State even conceded during its argument that appellant did not have "a lot of criminal history."

Further, there was substantial evidence of appellant's guilt presented during the guilt phase of trial, and the jury assessed appellant's punishment in the middle of the punishment range available. *See Motilla*, 78 S.W.3d at 355–56 (in assessing likelihood that jury's decision was adversely affected by error, we consider everything in record, including defendant's guilt); *Paroline*, 532 S.W.3d at 501–03 (holding any error in admission of evidence during punishment phase was harmless where "sentence received by [defendant] was in the mid-range of the punishment available to be assessed by the jury"); *see also Grant*, 2014 WL 131885, at *4–5 (noting evidence of defendant's guilt was substantial in holding any error in admission of photographs was harmless).

Accordingly, we hold that any error by the trial court in admitting State's Exhibits 92 and 93 into evidence during the punishment phase of trial was harmless.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).